UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
(at London)

| | | |
|---|---|---|
| TAMMY SUE REDMOND, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 6:22-CV-179-CHB |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| BELL COUNTY BOARD OF | ) | **AND ORDER** |
| EDUCATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on several motions.  First, the Defendants—the Kentucky Department of Education ("KDE") and the Board of Education of Bell County ("the Board")—have each filed motions for summary judgment.  *See* [R. 17]; [R. 19].  Second, Plaintiffs Tammy Sue Redmond and Stacie Slusher have filed a motion to strike.  [R. 23].  Third, the Plaintiffs have filed a motion for oral argument on the motions for summary judgment.  [R. 36].  The motions have been fully briefed, *see* [R. 24] (Plaintiffs' combined response to motions for summary judgment); [R. 33] (KDE's reply to motion for summary judgment); [R. 34] (the Board's reply to motion for summary judgment); [R. 30] (the Board's response to motion to strike); [R. 31] (KDE's response to motion to strike); [R. 37] (KDE's response to motion for oral argument); [R. 38] (the Board's response to motion for oral argument); *see also* LR 7.1(c) (no reply to the motion for oral argument was filed and the time to do so has expired).  The motions stand submitted for review.

For the following reasons, KDE's motion for summary judgment will be granted, the Board's motion for summary judgment will be granted, the Plaintiffs' motion to strike will be denied, and the Plaintiffs' motion for oral argument will be denied as moot.

I.      **Background**

- 1 -

The Bell County Area Technology Center ("ATC") is one of 50 or so area technology centers that the Kentucky Department of Education (through the Office of Career and Technical Education ("OCTE")) operates across the state.  [R. 1, ¶ 12]; *see also* [R. 24, pp. 1–2] (citing KRS 156.802).  The Bell County ATC has existed since 1966 and has never had a female principal.  *See* [R. 25-5, p. 8 (27:10–16)] (Redmond Deposition)[1]; *see also* [R. 1, ¶ 13].  Although the Bell County ATC serves the students of the Board, *see* [R. 24, p. 2], they are separate entities.  *See* [R. 1, ¶ 6].  The Plaintiffs describe the Board as "a non-profit educational school district existing and organized pursuant to KRS 160.160." *Id.* at ¶ 14.  Tom Gambrel is the superintendent of the Board.  *See* [R. 25-6, p. 3 (6:9–10)] (Gambrel Deposition).

Because ATCs are operated by KDE, they have state oversight, as Sarah Amanda Marth testified.  *See, e.g.*, [R. 25-1, p. 5 (14)] (Marth Deposition).  Thus, principals at ATCs are supervised by a KDE area supervisor, or academic consultant; in this case, Marth was the area supervisor for the Bell County ATC.  *Id.* at 5 (15:3–19) ("I have the East part of the state so I support 17 schools.  My job is to support the principals and help them make sure they have the information and tools necessary to link their school and their teachers.  We provide training for the principals.  We're their first point of contact when they have a question or an issue.  And then I also have to do their evaluations.").  Marth said her supervision of schools was not any different for those whose principals were hired by the OCTE versus those who were hired by a local board of education through a memorandum of agreement ("MOA").  *See id.* at 5 (16).  During the events

---

[1] Several deposition transcripts and exhibits appear in the record multiple times.  For consistency, the Court will cite to the same record entry for these transcripts and exhibits, even though those citations may differ from the parties' briefing.  Additionally, the deposition transcripts contain four pages of testimony per PDF page.  For clarity, the Court will cite to the page numbers for each record entry within CM/ECF, followed by the internal page numbers and line numbers, as necessary, for clarity.

giving rise to this litigation, Marth's supervisor was Division Director Karla Beth Hargis.  *See* [R. 25-2, p. 22 (82:12–15)] (Hargis Deposition).

In August 2020, the former principal of the Bell County ATC, David Sowders, retired or resigned.  *See, e.g.*, [R. 25-1, p. 8 (26:3–7)]; [R. 25-6, p. 9 (32)]; [R. 1, ¶ 19].  No one was formally designated as interim principal after Sowders left, but Redmond, at Sowders's request, took on certain tasks that a principal would normally perform.  *See, e.g.*, [R. 25-1, p. 9 (30:25–31:7)]; [R. 25-5, p. 8 (27:20–22)].  For example, Redmond helped onboard a newly hired teacher, provided Marth information on different software platforms being used by the programs at the Bell County ATC, and helped make inquiries regarding timekeeping.  *See* [R. 25-1, pp. 8, 34 (27:16–25, 130:25–131:19)].  Redmond testified that, while she was in this informal principal role, she met with Gambrel and Brian Crawford, principal at Bell County High School, to discuss the upcoming year at the Bell County ATC considering Sowders's retirement.  [R. 25-5, pp. 6–7 (21:11–22:9)]; *see also* [R. 25-12] (email from Redmond to Gambrel to set up meeting); [R. 25-6, p. 34 (132:3–5)] (Gambrel recalling there was "nothing impressive" about the meeting from Redmond).

Redmond, Slusher, and Matthew Gann each applied for the vacant ATC principal position in the fall of 2020.  *See* [R. 25-11]; [R. 25-13]; [R. 25-14].  Ultimately, Gann, a male who was under 40 at the time, was hired for the position.  Through this action, the Plaintiffs (who are both female and were over 50 at the time they applied) have sued the Board and KDE alleging discrimination "in failing to hire [the Plaintiffs] for a principal position because of their age, and/or sex."  *See* [R. 1, ¶ 1].

Redmond had been a health science instructor at the Bell County ATC for more than 25 years.  *Id.* at ¶ 16; [R. 25-11].  In that role, Redmond was an employee of the state, not the Board.  *See* [R. 25-5, p. 10 (37:24–25)] ("I was not an employee of the Bell County Board of Education.

- 3 -

We were state employees.").  Redmond has undergraduate degrees in nursing and career and technical education ("CTE"), a master's degree in CTE, and several certifications, including a Health Science Instructor teaching certificate and her Rank 1.  *See* [R. 25-11, p. 4]; *see also* [R. 25-5, pp. 4–5, 7 (13–14, 23)].  During her deposition, Redmond testified regarding her leadership experience, including courses she had taken and examinations she had passed, serving as a HOSA advisor for 25 years and taking students to conferences, coaching state officers, performing some of a principal's duties after Sowders retired, and serving as a school resource teacher.  *See* [R. 25-5, pp. 8, 14 (29, 50)]; *see also* HOSA – Future Health Professionals, https://hosa.org/about-hosa/ (last visited August 7, 2024) ("HOSA is an international student organization recognized by the U.S. Department of Education and the Health Science Education (HSE) Division of ACTE. HOSA's two-fold mission is to promote career opportunities in the health care industry and to enhance the delivery of quality health care to all people.  HOSA's goal is to encourage all health science instructors and students to join and be actively involved in the HSE-HOSA Partnership.").

Redmond holds a principal certification, *see* [R. 25-5, p. 5 (14)], and the Bell County ATC principal position was the first ATC principal position for which she had ever applied.  *Id.* at 7 (24:17–23).  In 2007, Redmond had wanted to apply for a principal position in Bell County, but she had not yet completed the required coursework and was told she could not apply because she did not "have those papers in hand."  *Id.* at 17 (63–64).

At the time she applied, Slusher had taught for more than 15 years, and she most recently taught high school business and science in Laurel County.  [R. 1, ¶ 17]; *see also* [R. 25-13, p. 5]. Slusher also began working as an adjunct professor at Morehead State University in 2019.  *See* [R. 25-4, p. 9 (32:10–15)] (Slusher Deposition).  She has a bachelor's degree in business education, a master's degree in business administration, and a doctorate in Educational Leadership, Educational

Technology.  *See* [R. 25-13, p. 4]; *see also* [R. 25-4, pp. 6–7 (21–23)].  In addition to her degrees, Slusher holds several teaching certificates, including business and marketing education (grades 5– 12), science (grades 5–9), Supervisor of Instruction, Director of Pupil Personnel, and her Rank 1; she also holds a principal certification and is a National Board Certified Teacher.  *See* [R. 25-4, p. 7 (23)]; *see also* [R. 25-13, p. 4].

Like Redmond, Slusher testified regarding her own leadership experience, and here, she highlighted her doctorate in educational leadership, serving as a mentor teacher, coaching others for National Board Candidacy, having done many presentations, serving on organizational boards, and serving in leadership roles on certain boards.  *See* [R. 25-4, p. 11 (38–39)].  Unlike Redmond, Slusher had applied for other principal positions before the Bell County ATC principal position, *see id.* at 11–12 (41–43), but still like Redmond, on one occasion when Slusher had wished to apply for a principal position (at the Caldwell County ATC), Slusher was told she would not be eligible because her coursework was not yet on her transcript and had not yet been added to her certificate, *see id.* at 11 (41).

When Slusher applied for the Bell County ATC principal position, she indicated that she would also be interested in a teaching or assistant principal position.  *See* [R. 25-13, p. 3]; *see also* [R. 25-4, p. 20 (74:18–75:8)].  But after Gann's teaching position became vacant when he was hired for the ATC principal position, Slusher was not contacted to interview for Gann's old teaching position; Slusher testified that the position "morphed into a slash special ed position," which she speculates was done to exclude her from being eligible for the spot.  *See* [R. 25-4, p. 20 (76:5–22)].

 Gann was under 40 at the time he applied for the ATC principal position.  *See* [R. 25-9, p. 11 (38:21–24)] (Gann Deposition).  At the time he applied, Gann had taught business at Bell

County High School for nine years.  *See* [R. 1, ¶ 18]; *see also* [R. 25-14, p. 5].  He has a bachelor's degree in marketing and a master's degree in MAT Secondary (MAT stands for Master of Arts in teaching).  *See* [R. 25-14, p. 4]; *see also* [R. 25-9, p. 3 (7)].  He also has a professional certificate for teaching business and marketing education (grades 5–12).  *See* [R. 25-14, p. 4].  In 2011, Gann applied for and was offered a teaching position in Bell County (over Slusher) in a manner that did not comply with state certification rules.  *See* [R. 25-3] (Office of Education Accountability opinion); *see also* [R. 25-4, p. 20 (74)].

While a teacher at Bell County High School, Gann served as the CTE coordinator, which Marth described as "a department head for all the CTE courses that are taught at a district."  *See* [R. 25-1, pp. 14–15 (53:22–54:3)].  In that role, he was responsible for entering TEDS data regarding students who are taking particular courses.  *See id.* at 15 (54:3–6) ("And that particular person is responsible for the TEDS data, and that is entering all the students that are taking any of those courses have to be entered into TEDS.  I do not know what that stands for.  I just know it's a database, that if a student – all their credentials, all their testing, all their industry certifications, everything  has to be in this program.").  "And then the CTE coordinator is also in charge of the Perkins plan, which is federal money that the school district gets for their CTE programs based upon how many students and how many programs they have."  *Id.* at 15 (54:11–15); *see also* [R. 25-9, pp. 5–8 (20–29)] (Gann discussing his responsibilities as the CTE coordinator and TEDS coordinator and his work on the Perkins grant).  At the time he submitted his application for the Bell County ATC principal position, Gann did not have a principal certification or his Rank 1.  *See, e.g.*, [R. 22-22] (Option 6 letter issued October 9, 2020); *see also* [R. 25-14].  The parties dispute whether the certification Gann eventually obtained was sufficient under Kentucky law for

the Bell County ATC principal position; the Court will explore this legal issue in more detail below.

To fill the Bell County ATC principal position, the Board and KDE had two options.  First, KDE could hire the principal directly.  *See* [R. 25-2, p. 4 (11:12–13)] ("[W]e can follow our normal hiring practices in the department and the principal can be an employee of KDE[.]").  Second, through an MOA, the Board could hire the principal and be reimbursed by KDE for the expense, meaning the principal would be a Board employee (rather than a KDE employee).  *See id.* at 4, 6 (11–12, 18:9–15) ("[O]r they have the option of doing the MOA if they so choose.").  Under an MOA, the ATC principal would be "held to the Kentucky Tech policies" and would also have to follow the Board's policies.  *Id.* at 6 (18:20); [R. 25-1, p. 10 (37:19–23)].  Hargis testified that MOAs are often used due to salary scales because districts "are able to pay that principal more if they hire them through the district."  [R. 25-2, p. 4 (11:24–12:3)].  MOAs also allow a district to assign other duties to an ATC principal because the principal is an employee of the local school district rather than KDE.  *Id.* at 4 (12–13); *see also* [R. 25-6, p. 7 (24:1–2)] (Gambrel testifying that the MOA meant KDE provided its teachers, and the Board provided the building).

To fill the Bell County ATC principal position, the Board chose to execute an MOA, which Gambrel signed on October 6.[2]  *See* [R. 25-15] (MOA).  The contract amount was $49,955.  *See id.* at 1; [R. 25-2, p. 6 (18–19)].  As just mentioned, under the MOA, the ATC principal would be required to follow the Board and KDE policies, and the Board and KDE would have joint supervision of the principal.  [R. 25-15]; [R. 25-1, p. 10 (37)]; *see* also [R. 25-2, p. 7 (23)].  However, "KDE maintain[ed] ultimate authority."  [R. 25-2, p. 7 (23:7–22)]; *see also* [R. 25-15]; [R. 25-6, p. 8 (26)].

---

[2] Unless otherwise noted, dates refer to the year 2020.

Marth testified that she thought Bell County wanted the ATC principal to be under an MOA because there had not been "a great relationship with the past principal and they just wanted a little more control."  [R. 25-1, p. 9 (31:8–12)].  Similarly, Gambrel testified that the Board chose the MOA route because it would give the Board more input and more access to the ATC principal and would allow the ATC principal to do certain tasks, like watch students even if they were not ATC students.  *See* [R. 25-6, pp. 7–8 (25–26)].

The record also suggests that the MOA option meant the Board had flexibility in the interview process.  For example, the Plaintiffs maintain that OCTE policy required four people to be on the interview committee, *see* [R. 24, pp. 10–11], but Marth testified that Gambrel was permitted to choose the people who would do the interviews, and Hargis testified that she was unaware from an MOA standpoint of any requirements regarding who should participate in the interviews.  *See, e.g.*, [R. 25-1, p. 7 (22:22–23:9)] (Marth discussing committee for an OCTE posting); [R. 25-1, p. 38 (148:19–25)] (Marth explaining that she suggested to Gambrel who should be on the panel, but believed the choice was his to set up the interview committee as he saw fit); [R. 25-2, pp. 14–15 (53:22–54:5)].

Before the ATC principal position was posted, Redmond and Slusher already had their principal certifications.  Gann, however, did not.  Thus, he began to compile information on how he could become certified.  *See* [R. 25-9, p. 9 (30)].  Specifically, Gann sought information on Option 6, a process under Kentucky law by which an individual can obtain certain educational certifications.  *See* KRS 161.048(7) (2017).[3]  During her deposition, Hargis explained:

_____

[3] The Court cites the statute that was in effect during the time of the application and interview process for the Bell County ATC principal position in the fall of 2020.  KRS 161.048(7) was amended in April 2024 to remove reference to the Kentucky Teacher Internship Program.  The Court does not understand that change to have an impact to the legal issues involved in this case.

> Option 6 is an alternate certification where from the teaching standpoint if someone has a bachelor's degree . . . in an area that is not a teaching area, then they can get certified before starting their coursework.
>
> And the same thing applies for a principal.  They can do an Option 6, they can enroll in the program and they can be granted a letter from the university that has the Option 6 program and it goes through Licensure and Licensure can tell us whether or not they are actually enrolled in the Option 6.  And then if they are enrolled, then they are eligible for interview and hire.

[R. 25-2, pp. 8–9 (29:17–30:4)]; *see also* [R. 25-6, p. 15 (56:24–57:2)] ("The Option 6 program is where a participant has not completed all of the requirements for a certification, but [the Education Professional Standards Board ('EPSB')] allows them to become certified and complete the program as they work.").  The EPSB is the entity tasked under Kentucky law with the authority and responsibility to establish standards and requirements for obtaining and maintaining teaching certificates and, relevant to this case, principal certificates.  *See* KRS 161.028(1)(a) (2022); KRS 161.020(1)(a) (2014) ("No person shall be eligible to hold the position of superintendent, principal, teacher, supervisor, director of pupil personnel, or other public school position for which certificates may be issued, or receive salary for services rendered in the position, unless he or she holds a certificate of legal qualifications for the position, issued by the Education Professional Standards Board.").  Gann first called the EPSB to ask about Option 6, *see* [R. 25-9, p. 9 (30)], and on September 21, Gann emailed Eastern Kentucky University to request information on "next steps in order to receive the Option 6 Letter."  *See* [R. 25-21, p. 1].

Marth and Hargis both testified that they had never heard of Option 6 before Gann's application process.  *See* [R. 25-1, p. 6 (20:21–23)]; [R. 25-2, p. 16 (60:2–3)].  Hargis even had two conversations with Gann when he was seeking information regarding how to become certified, and she told him he was ineligible because she was unfamiliar with Option 6.  *See* [R. 25-2, p. 16 (59:20–60:17)].  The record further contains evidence that, up until the day before all three

applicants were interviewed, Marth had lingering concerns that Gann would be ineligible for the position because he did not hold the proper certification, and Gambrel likewise told Marth that he did not want to interview Gann if Gann was ineligible.  *See* [R. 25-24, p. 1].

Still, Hargis and Marth consistently testified that they routinely rely on Licensure, *a.k.a.* the Office of Education, Licensure and Effectiveness, which provides responses to certification questions based on the EPSB regulations and Kentucky law, *see* [R. 25-2, p. 21 (78:24–79:6)], to tell them who is certified for positions under Kentucky law.  *See, e.g.*, *id.* at 17 (63:20–21) ("And again, we are dependent upon Licensure and Regulation telling us if people qualify."); *see also* [R. 25-1, p. 6 (18:13–18)] ("[W]e look at their experience and their background.  But ultimately if we – I send them to our personnel who checks certification and things so they ultimately tell me whether or not they are certified or qualified for me to interview.").  Hargis testified that the EPSB "works with the Licensure division" and is the board that "sets the standards related to Licensure." [R. 25-2, p. 21 (78)].

Specifically in this case, Marth testified that she would direct her certification questions to Carmella Clark, whom she assumed worked for KDE in Frankfort.  *See* [R. 25-1, p. 6 (18:19–24)]. In Gann's situation, Clark contacted Crystal Hord, Branch Manager in Licensure, and Hord said Gann could qualify under Option 6 if he met all the requirements.  *See* [R. 23-1, p. 1].  The Plaintiffs argue that Clark did not specify that Gann had applied for an ATC principal position, rather than a traditional principal position, when she contacted Hord.  *See* [R. 24, p. 10] ("One key fact was omitted from Clark's email, Gann was applying for a principal position with an ATC."). However, Gann's Application for Temporary Provisional Certification did state that he was applying for an ATC principal position.  *See* [R. 33-1, p. 1].  At that time, Hord confirmed Gann would be eligible under Option 6 if he met the requirements.  *See* [R. 23-1, p. 1].  Gambrel testified

that he relied on the EPSB's determination that Gann was eligible during the application and interview process. *See* [R. 25-6, p. 31 (120:19–21)] ("It's my testimony that EPSB had said he is eligible for that, and to me that means he did have a certificate.").

Relatedly, Hargis testified that KDE does not want to go against what Licensure advises because KDE wants "to build a good relationship with . . . the school district in general and partner with them." [R. 25-2, p. 14 (50:4–9)]. And Hargis and Marth both testified that they now know there are multiple ways an individual can obtain a principal certification for an ATC principal position, including Option 6, because that was what had been done in Gann's situation. *See id.* at 17 (63:25–64:5); [R. 25-1, p. 6 (20)].

Returning to the timeline of this case, Gann submitted his application to EKU on September 23, noting there would be a principal position posted soon that he would "have a chance at." [R. 25-9, p. 11 (40:14–21)]. The Bell County ATC principal position was also posted that day. *See* [R. 25-10]. The posting did not list minimum requirements, *see id.*, and had to be posted for 15 days. *See* [R. 25-6, p. 16 (59)]. The posting listed the start date for the position as October 15. *See* [R. 25-10].

On September 29, Gann drafted a letter of recommendation for Gambrel to sign to complete his application to EKU. *See* [R. 25-9, pp. 12–13 (45–46)] (Gann testified that it "appeared" he drafted the letter, but he did not remember doing so); [R. 25-16]. A few days later, on October 2, Gann emailed EKU asking about how long it would take to receive an Option 6 letter. *See* [R. 25-18]. Later that day, Gann was informed by EKU that he could not receive the letter until he was admitted and enrolled in classes. *See* [R. 25-19]. Gann submitted his application for the principal position later that day. *See* [R. 25-20, p. 1]; *see also* [R. 25-14].

Also on October 2, Marth asked Gambrel when the interviews for the ATC principal position would take place. *See* [R. 25-17, p. 2]. Gambrel responded that the job would have been posted for the required 15 days on October 8, so they could review the applications on October 9 and conduct interviews on October 13. *Id.* at 1–2. On October 9, Marth asked Gambrel whether he still wanted to interview candidates on October 13. *See* [R. 25-23]. The interviews ended up being pushed back by a few days to October 15, but neither Marth nor Gambrel could remember why. *See* [R. 25-1, p. 10 (36:18–21)]; [R. 25-6, p. 17 (62–63)]. Even so, Gambrel testified the interviews were not pushed back so that Gann could gather additional documents regarding his eligibility under Option 6. [R. 25-6, p. 17 (63–64)]. October 9 was also the day Gann was admitted to EKU and enrolled in classes, which started three days later, and the day he received his Option 6 letter of eligibility. *See* [R. 25-21]; [R. 25-22]; *see also* [R. 25-9, p. 15 (55)]. Gann admits that he would have supplemented his original application with his Option 6 letter. *See* [R. 25-9, p. 13 (48–49)].

On October 13, Gambrel sent all the applications to Marth; Gann's Option 6 letter was attached to his application. *See* [R. 25-1, pp. 13, 17–18 (48–49, 65–66)]. Once Marth received the applications, she reviewed them to see the experience and background of the applicants and to see whether the applicants were eligible for the principal position. *See id.* at 6 (18:13–18). At that time, Marth had concerns over Gann's credentials because he did not have a principal certification. *Id.* at 11 (38:13–39:6) ("I wasn't going to interview him if he was not certified for the position."). So, she checked with Gambrel, who told her to get in touch with Gann because Gann had told Gambrel he was certified. *See* [R. 25-24, p. 1] ("Matt said they had told him he did meet the requirements. Can you contact him and find out what he is referencing? I don't want to interview him if you are certain that he is ineligible."). By comparison, Redmond and Slusher both had their

- 12 -

principal certifications at the time they applied. *See, e.g.*, [R. 25-11]; [R. 25-13]. During her deposition, Marth said Gann's application was not on equal footing, at least on paper, with Redmond's and Slusher's because he had not completed any coursework toward his Rank 1 certification. [R. 25-1, p. 17 (64:19–65:7)].

One of the areas in which Marth focused her attention when reviewing the written applications was to see what leadership responsibilities or roles the applicants had held in the past. *See id.* at 7 (22:11–14). Similarly, during the interviews, Marth looked for someone who could lead the teachers and staff, "bring that school up to the next level," and who could fit in with the staff. *Id.* at 9 (33:16–19). Marth spoke with Gambrel before the interviews, and he stressed that he wanted to see "more rigor," meaning tighter instruction and less downtime, and increased industry certifications at the ATC. *Id.* at 10 (34:24–25:18).

All three interviews were held at the Bell County Board of Education on October 15. *See id.* at 21 (78:10–12); [R. 25-5, p. 9 (31:5–6)]. Gambrel and the applicants attended the interviews in person, and Marth participated via Zoom. *See* [R. 25-6, p. 20 (77:18–20)]. All three candidates were asked the same questions, *see* [R. 25-1, p. 22 (82:13–16)], and the interviews were set to last about 20 minutes, *see* [R. 25-24, p. 1]. Marth recalls leading the interviews (because Gambrel "leaned on [her] for specifics" about "ATC items"), *see* [R. 25-1, pp. 23, 33 (88:20–24, 128:8–10)], and she and Gambrel had "very, very short" conversations between the candidates, *see id.* at 23 (88:3–7).

Slusher was the first candidate to be interviewed. *See id.* at 22 (82:10–12). During her deposition, Marth did not recall any specifics regarding Slusher's strengths or weaknesses. *See id.* 37–38 (145:25–146:4). For his part, Gambrel described Slusher's interview as "not impressive," said that he had been put off by Slusher's attempts to name drop, described Slusher as being

"overconfident and overreaching," particularly in her namedropping, and said her interview lasted "40 minutes plus" because Slusher liked to talk.  *See* [R. 25-6, pp. 23, 24, 28 (89:6–11, 91:12–15, 107:8)].  For her part, Slusher described the interview as "rushed," said Gambrel seemed to misunderstand some of the topics discussed and was dismissive of some of her answers, and said Gambrel "was looking at his phone or whatnot."  [R. 25-4, p. 10 (35–37)].

Redmond was the second candidate to be interviewed.  *See* [R. 25-1, p. 23 (89:10–12)]. Both Marth and Gambrel said Redmond's answers (even if not incorrect) were unsatisfactory because Redmond only responded through the "eye of the health science teacher," meaning Redmond did not seem as familiar with the other programs at the school.  *Id.* at 26, 28–29 (100:18– 19, 109–10); *see also* [R. 25-6, p. 25 (94:21–25)].  Marth said that one of Redmond's strengths was that she had been a teacher at the Bell County ATC for a long time but noted that could also be a weakness.  *See* [R. 25-1, p. 28 (109)].  In a similar vein, Gambrel said Redmond did not have a "confrontational personality" that would be needed in the principal position.  [R. 25-6, p. 28 (106:9–10)].  Gambrel also said that Redmond's answer that "organized chaos" would describe an exemplary CTE classroom was lacking as was her answer that she had always wanted to be a school principal when asked why she wanted the job.  *Id.* at 24–25 (93:9–14, 96:9–97:3).  Like Slusher, Redmond said Gambrel mentioned "time constraints" for the interview, "kept playing with his phone a lot" during the interview, and had "no earthly idea what [she] was talking about" when she responded to a particular aspect of courses at the school.  *See* [R. 25-5, pp. 7–8 (24–26)].

Gann was the third applicant to be interviewed, and Marth and Gambrel both thought that he was the best applicant following the interviews.  *See* [R. 25-1, p. 27 (105)]; [R. 25-6, p. 31 (118:24–119:1)]; *see also* [R. 25-2, p. 10 (34:8)] (Hargis explaining that, for principal positions, "what [they] count on is the interview process").  In particular, they "liked what he had to say

about his vision for the school, and seeing it be more in the eye of the public. And making it more rigorous." [R. 25-1, p. 29 (112:8–14)]. Marth and Gambrel also both cited Gann's roles as the CTE coordinator and the TEDS coordinator and his work on the Perkins grant as key experience demonstrating his leadership.[4] *See id.* at 14–15 (53–54); [R. 25-6, p. 40 (155:5–9)] ("I think all of them had work experience in teaching in CTE, but none of them had experience leading in ATC other than Matt had his CTE leader and TEDS experience and the Perkins[.]").

Immediately after the interviews, Marth and Gambrel debriefed and agreed Gann was the strongest applicant. *See, e.g.*, [R. 25-6, p. 31 (118:24–119:1)]. They also agreed to have a night to think about it, and when they discussed it again, they continued to agree they should offer Gann the position. *See id.* at 31 (119). Gann was offered the position on October 23, *see* [R. 25-9, p. 18 (66–67)], and started in the ATC principal position a couple weeks later on November 9. Gann's principal certificate from the state says it was effective as of November 9.[5] *See* [R. 25-28].

Gambrel notified Redmond and Slusher that they did not receive the job. *See* [R. 25-5, p. 15 (57)]; [R. 25-4, p. 19 (70)]. The women were disappointed that a female was not hired for the position and were "shocked" Gann was selected for the position. *See* [R. 25-4, p. 11 (40:15–21)]. When Gambrel contacted Slusher, she asked him how Gann could have been offered the job when he did not have a principal certification, and Gambrel told her that they were going to work to get Gann approved via Option 6. *See id.* at 13 (46). Slusher speculated that her and Redmond's age was an issue for the Board in hiring either of them for the ATC principal position based on financial

---

[4] Marth testified that Redmond's having written a "grant for the collaboration of secondary education and career technical education teachers to work and create lessons that intertwined with science and math collaboration" did not demonstrate leadership; by contrast, Marth and Gambrel both highlighted Gann's work on the Perkins grant as a factor in determining Gann's leadership experience and considering him the better candidate. [R. 25-1, pp. 15–16 (57, 60–61)]; *see also* [R. 25-6, p. 34 (130–31)].

[5] When the Court refers to Gann's principal certification in this Memorandum Opinion and Order, it means the certificate he was issued by the EPSB under Option 6. *See* [R. 25-28].

- 15 -

considerations.  *See id.* at 15 (55:9–14) ("We cost more money. . . . Typically, the older you are, the more experience[] you have.  The more experience in education you have, the more money you cost the school district or the employer.").  When asked whether they had proof "[o]ther than hearsay, gossip, [or] chitchat" that there was "a systemic issue in Bell County regarding the hiring of males over females," Slusher cited the fact that there had never been a female principal at the Bell County ATC, *see id.* at 15 (54:13–22), and Redmond said she had none, *see* [R. 25-5, p. 13 (46:25–47:4)].

Both women testified that, after learning they were not selected for the position, they saw EPSB records showing Gann did not have the proper certification.  *See* [R. 25-4, p. 13 (46:14–19)]; [R. 25-5, p. 10 (34)].  Redmond said she looked at the EPSB's website every day until Gann's certification "hit," which was in November 2020.  *See* [R. 25-5, p. 10 (34)].  Redmond also testified that she knew Gann was not enrolled in classes at EKU prior to January 2021.  *See id.* at 11 (38–39).  After being notified they did not get the ATC principal position, both women filed separate gender and age discrimination claims with the Equal Employment Opportunity Commission ("EEOC"); Slusher later amended hers to also allege retaliation.  *See* [R. 25-27]; *see also* [R. 24, pp. 13–14].  The EEOC turned the matter over to the Department of Justice, and the women ultimately received right to sue letters.  *See* [R. 25-4, p. 15 (57)]; [R. 25-5, p. 14 (51)].  Subsequently, the Plaintiffs filed this federal action on September 23, 2022.  [R. 1].

The Plaintiffs' Complaint alleges three counts: (1) sex discrimination under federal law (Title VII of the Civil Rights Act of 1964) and state law (the Kentucky Civil Rights Act ("KCRA")); (2) age discrimination under federal law (Age Discrimination in Employment Act ("ADEA")) and state law (KCRA); and (3) retaliation related to Slusher only.  *See* [R. 1].  The Defendants answered the Plaintiff's Complaint, *see* [R. 8]; [R. 10], and the parties proceeded to

- 16 -

engage in discovery, *see* [R. 12]. The parties' present motions were filed in late 2023 and briefed in accordance with the Joint Local Rules. *See, e.g.*, [R. 17]; [R. 19]; [R. 23]; [R. 36]. The motions stand submitted for review.

## II.   Analysis

### a.   Option 6

The Plaintiffs claim that they were discriminated against based on their sex and/or age when Gann was selected for the Bell County ATC principal position over them. The Court will discuss the particular elements of the Plaintiffs' discrimination claims below. First, however, it will address one of the Plaintiffs' key arguments: that Gann was not qualified for the Bell County ATC principal position under Kentucky law. *See, e.g.*, [R. 24, pp. 15–17]; *see also* [R. 23, p. 1] ("Plaintiffs allege that they were passed over for a principal position in Bell County in favor of an unqualified, younger, male applicant. In part, Plaintiffs argue that Matthew Gann was not qualified to apply to the principal position because he did not hold a principal certification and was not enrolled in a principalship program at the time he applied."). The Defendants, predictably, adamantly maintain that Gann was properly certified for the Bell County ATC position under Kentucky law, and specifically through Option 6. *See, e.g.*, [R. 33]; [R. 34]. A brief detour to discuss the relevant Kentucky statutes and regulations concerning principal certification places the parties' arguments in context.

First, recall that Option 6 is a particular pathway by which individuals can obtain certain educational certifications. *See, e.g.*, Regulatory Impact Analysis and Tiering Statement for proposed amendments to 16 KAR 9:080, *available at* https://apps.legislature.ky.gov/law/kar/titles/016/009/080/ (last visited August 5, 2024) ("KRS

161.048(7) creates Option 6 alternative route to certification . . . ."). At the time of Gann's hiring,

Option 6 was defined by statute as follows:

> Option 6: University alternative program. With approval of the Education Professional Standards Board, a university may provide an alternative program that enrolls students in a postbaccalaureate teacher preparation program concurrently with employment as a teacher in a local school district. A student in the alternative program shall be granted a one (1) year provisional certificate and shall participate in the Kentucky teacher internship program, notwithstanding provisions of KRS 161.030. A student may not participate in the internship program until the student has successfully completed the assessments required by the board. The one (1) year provisional certificate may be renewed two (2) additional years, and shall be contingent upon the candidate's continued enrollment in the preparation program and compliance with all requirements established by the board. A professional certificate shall be issued upon the teacher candidate's successful completion of the program, the internship program requirements, and all academic content assessments in the specific teaching field of the applicant as designated by the Education Professional Standards Board.

KRS 161.048(7) (amended July 13, 2022).[6] That same statute authorized the EPSB to "promulgate

administrative regulations establishing standards and procedures for the alternative certification

options described in this section," including Option 6. KRS 161.048(1)(e) (amended July 13,

2022).

Additionally, by Kentucky statute, the EPSB "has the authority and responsibility to":

> Grant approval, if appropriate, of a university's request for an alternative program that enrolls an *administrator candidate* in a postbaccalaureate administrator preparation program concurrently with employment as an *assistant principal, principal, assistant superintendent, or superintendent in a local school district*. An administrator candidate in the alternative program shall be granted a temporary provisional certificate and shall be a candidate in the Kentucky Principal Internship Program, notwithstanding provisions of KRS 161.030, or the Superintendent's Assessment process, notwithstanding provisions of KRS 156.111, as appropriate. The temporary certificate shall be valid for a maximum of two (2) years, and shall be contingent upon the candidate's continued enrollment in the preparation program and compliance with all requirements established by the board. A professional certificate shall be issued upon the candidate's successful completion of the program, internship requirements, and assessments as required by the board.

---

[6] The Court cites to the version of the statute in effect at the time of Gann's hiring. The cited version was in effect from June 29, 2017 through July 13, 2022.

KRS 161.028(1)(t) (amended June 29, 2021) (cleaned up) (emphasis added).[7] As these statutes make clear, an alternative certification option, like Option 6, is available not only to teachers, but to administrators as well.

More recent Kentucky regulations further clarify Option 6's application to administrator positions. *See* 16 KAR 9:080 ("KRS 161.048(1)(d) and (7) require the Education Professional Standards Board (EPSB) to promulgate administrative regulations establishing the standards and procedures for a university alternative certification option for teacher *and administrator* certification. This administrative regulation establishes the requirements for entry and completion of the teacher *and administrator* university-based alternative certification options, the responsibilities of the employing school or school district, and the responsibilities of the approved college or university alternative program.") (emphasis added).[8] Those regulations further define "alternative certification administrator program" as:

> a college or university post baccalaureate or post masters administrator preparation program for an individual enrolled concurrently with employment in a local school district *as an assistant principal, principal, assistant superintendent, school counselor, director of special education, director of pupil personnel, supervisor of instruction, or superintendent.*

*Id.* at Section 1(1) (emphasis added); *see generally id.* Sections 8–12. Other requirements for Option 6 are also outlined by Kentucky regulation. *See* 16 KAR 9:080.

In this action, the Plaintiffs primarily argue that Option 6 is *unavailable* for individuals seeking to hold an ATC principal position. Instead, according to the Plaintiffs, other Kentucky

---

[7] The Court cites the version of the statute in effect at the time of Gann's hiring. It appears, however, that the language in the current version is the same as prior versions, although the paragraphs have been renumbered. *See, e.g.*, KRS 161.028(1)(p).

[8] The Court quotes from the version of the regulation in effect at the time of the parties' briefing, which appears to be the version cited and discussed by both parties.

regulations, namely 16 KAR 3:080 and 780 KAR 3:140 Section 3(1), and OCTE's own policy 3.112,[9] set *separate* requirements for an ATC principal position. *See* [R. 24, pp. 15–17].

According to the Plaintiffs, 16 KAR 3:080, which "establishes the certification requirements for career and technical education school principals," only provides two certificates that were "valid for the position of school principal": (1) the certificate for career and technical education school principal; or (2) a certificate for instructional leadership—school principal. 16 KAR 3:080 Section 2; *see also* [R. 24, pp. 15–16].[10] Further, the Plaintiffs maintain that 780 KAR 3:140 Section 3(1) requires a school administrator to be certified pursuant to 16 KAR Chapters 2 or 3, meaning Option 6 is not a pathway because it appears in 16 KAR Chapter *9*. *See* [R. 24, pp. 15–16]. Finally, the Plaintiffs rely on OCTE policy 3.112, which states:

> Area Technology Center Principals must hold (1) of the following: (1) Certificate for a Career and Technical Education School Principal or (2) Certificate for Instructional Leadership-School Principal. Requirements for a Career and Technical Education Principal are as follows:
>
> > A. Minimum of three (3) years of teaching experience in the field of Career & Technical Education;
> >
> > B. Complete an approved educator preparation program for Career and Technical Education Principal, per 016 KAR 005:010; and
> >
> > C. Obtain the specified minimum score on any assessment required by 016 KAR 006:030.

[R. 25-29, p. 5]. Comparing this policy to 16 KAR 3:080 shows the policy parrots the language of the regulation.

---

[9] Recall that OCTE stands for the Office of Career and Technical Education and is the office within KDE that oversees ATCs across the state.

[10] 16 KAR 3:080 was amended in October 2022, but only stylistically changed the portion of the regulation the Plaintiffs rely on.

In their briefing, neither Defendant replied to the Plaintiffs' argument regarding 16 KAR 3:080. Still, KDE points out that OCTE policy 3.112 only applies to KRS Chapter 156 applicants and that KRS 156.800–860 applies to employees of the OCTE. *See* [R. 33, p. 6]. KDE further maintains that, because (under the MOA) Gann was hired to be a Board employee, he falls under KRS Chapter 161 (*not* Chapter 156), meaning Option 6 *is* available to him. *See id.* at 6–7 (citing KRS 161.730; KRS 161.720(1)). Similarly, KDE submits that 780 KAR 3:140 Section 1 references "[e]ach certified or equivalent employee in the Office of Career and Technical Education," meaning it also does not apply to Gann, who was hired by the Board and was not an OCTE employee. *See id.* at 7.

In this action, no one disputes that Gann was hired by the Board and *not* by KDE (i.e., OCTE). Thus, he was *not* a Chapter 156 hire, which makes the regulations and policy that the Plaintiffs rely upon inapposite to his hiring. Instead, Gann was a Chapter 161 hire, making Option 6 an available pathway for his certification. Notably, such a legal conclusion is supported factually by the record in this case.

First, and most significantly, Gann's Application for Temporary Provisional Certification *did* show he was applying for an ATC principal position, and the EPSB, the Board tasked with issuing certain educational certificates under Kentucky law, *did* issue his certificate in November 2020. *See* [R. 33-1, p. 1]; [R. 25-28] ("This certifies that Matthew Aaron Gann has completed a program of professional preparation and is hereby issued this certificate in accordance with Section 161 of the Kentucky Revised Statues and in accordance with the legal authority of the Kentucky Education Professional Standards Board."). That the entity tasked by Kentucky law with issuing such certifications found Gann had completed the appropriate tasks and ultimately issued him an Option 6 certification provides weighty evidence in support of the Court's legal understanding of

Option 6 as applied to the facts of this case.  To the extent that any of the steps Gann took to obtain his Option 6 certification are factually relevant to the merits of the Plaintiffs' discrimination claims, they will be discussed in more detail below.

Second, the distinctions KDE represents exist between Chapter 156 (or state) hires and Chapter 161 (or local) hires are borne out by the job postings for the ATC principal positions in Letcher and Floyd Counties that the Plaintiffs have filed in the record.  Those postings listed the requirements that the Plaintiffs argue should apply to Gann, but importantly, those positions were to be hired by KDE (not through MOAs with the local school districts).  *Compare* [R. 25-30], *with* [R. 25-10]; *see* [R. 24, pp. 16–17]; *see also* [R. 25-2, p. 13 (46)].  As discussed above, the Bell County ATC principal position was being filled by an MOA (meaning the applicant was to be hired by the Board, *not* KDE), which explains why it did *not* include the requirements for a KDE hire that the Letcher and Floyd postings did.

Next, the Plaintiffs argue that, "[e]ven if a temporary certificate were sufficient, Gann was not eligible to apply for the Bell County ATC principal position" because "Gann did not have his Option 6 letter at the time he applied for the Bell County ATC principal position."  *See* [R. 24, p. 17] (citing 16 KAR 9:080 Section 10(1)).  The Court devotes little attention to this argument as the relevant statutes and regulations contemplate that a candidate would seek certification under Option 6 while also seeking employment.  *See, e.g.*, KRS 161.028(1)(p) (2022) (explaining ESPB's ability to "[g]rant approval, if appropriate, of a university's request for an alternative program that enrolls an administrator candidate in a postbaccalaureate administrator preparation program *concurrently with employment* as an assistant principal, principal, assistant superintendent, or superintendent in a local school district.") (emphasis added); *see also Qiu v. Bd. of Educ. of Woodford Cnty. Pub. Sch.*, No. CV 5:22-196-DCR, 2023 WL 8099107, at *1 (E.D. Ky.

Nov. 21, 2023), *aff'd sub nom. Qiu v. Woodford Cnty., KY Bd. of Educ.*, No. 23-6058, 2024 WL 3272790 (6th Cir. July 1, 2024) ("Under Option 6, a student receives a one-year provisional certificate 'concurrently with employment as a teacher in a local school district.' KRS 161.048(7) (2017) (emphasis added). Accordingly, an applicant would not have to begin attending Option 6 classes until he or she was hired and teaching.").

In sum, the Court finds Kentucky law allowed Gann to be properly certified for the Bell County ATC principal position through Option 6. Although the Plaintiffs request oral argument so the parties can present their interpretations of Kentucky law regarding principal certification, [R. 36], the Court has resolved that question on the briefs and will therefore deny the Plaintiffs' motion for oral argument as moot. With the foundational legal issue regarding Option 6 decided, the Court turns to the other pending motions in this action.

### b. Motion to Strike

The Court next considers the Plaintiffs' motion to strike, in which they request that the Court strike the Board's Expert Disclosure and Declaration of Crystal Hord. *See* [R. 23]. To understand the Plaintiff's motion to strike, the Court must consider the procedural history of this litigation.

Under the Scheduling Order entered on November 10, 2022, the parties' initial disclosures were due November 30, 2022, and the Defendants' expert disclosures were due July 31, 2023. *See* [R. 12, ¶¶ 1, 4]. Fact discovery was to be completed by August 31, 2023, and expert discovery was to be completed by September 30, 2023. *See id.* ¶ 3. The Board timely complied with its initial disclosures on November 30, 2022, but it did not disclose Hord as an "individual likely to have discoverable information" at that time. *See* [R. 23-2, ¶ A] (listing nine "individual[s] likely to have discoverable information"). The Board did, however, list "Representative of Education

Professional Standards Board" as an "individual likely to have discoverable information" and who would have "knowledge regarding Matthew Gann's credentials for the position of Principal." *Id.* at ¶ A(9). The Board also "reserve[d] the right to call any witness identified by any other party to this litigation listed on any disclosure or primary or final witness list, or any supplement or amendment thereto, or in the course of discovery, and any and all witnesses necessary for rebuttal, impeachment, or for authentication" and "reserve[d] the right to supplement or amend the foregoing in accordance with proof disclosed prior to or at the trial of this action." *Id.* at ¶ A.

Relatedly, the Board did not list Hord in its response to an interrogatory regarding all person(s) who "have knowledge of facts that relate to any of the claims or defenses in this action." *See* [R. 23-3, pp. 4–5] (Response to Interrog. No. 2) (served on July 20, 2023). Instead, the Board pointed back to the individuals who had been disclosed in its initial disclosures. *See id.* Also notable in this context, as KDE points out, *see* [R. 31], is the fact that both Plaintiffs listed Hord as a likely witness who would be called at trial in the answers they provided to interrogatories in January 2023. *See* [R. 31-1, p. 8] (Response to Interrog. No. 5); [R. 31-2, p. 9] (Response to Interrog. No. 5).

On July 31, 2023 (the day expert disclosures were due under the Scheduling Order), the Board requested an extension of the expert disclosure deadline from other counsel, but when the Board's counsel did not hear back from the Plaintiffs' counsel (who was on vacation), the Board's counsel proceeded to disclose Crystal Hord as an expert witness and provided a copy of Hord's CV to other counsel. *See* [R. 23-4]; *see also* [R. 23-5]. At that time, the Board's expert witness disclosure read:

> Crystal Hord
> Former Branch Manager (2019 – July 2023)
> Kentucky Department of Education
> Frankfort, KY

Ms. Hord was the Branch Manager at the Kentucky Department of Education, charged with matters related to educator certification and licensure, at the time of the events giving rise to Plaintiffs' Complaint. Ms. Hord is expected to testify regarding the certification of Matthew Gann as it relates to this lawsuit.

[R. 23-5, p. 1].   The Board's counsel further represented that the Board would "supplement its discovery responses regarding Ms. Hord's expert opinion within ten (10) days of this disclosure." *Id.*; *see also* [R. 23-4, p. 1].  On August 11, 2023, the Board provided Hord's declaration to other counsel.  *See* [R. 17-1]; *see also* [R. 19-2] (another place Hord's declaration was filed in the record); [R. 30-2] (same).  That declaration reads in relevant part:

4.  KRS 161.028(1)(p) is the statute establishing alternative certification programs for administrators.  Alternative certification candidates can be considered for employment on an equal hiring basis with other candidates who hold appropriate certification, pursuant to KRS 160.345(2)(h).

5.  Mr. Matthew Gann ("Gann") was already admitted to a principal program prior to being interviewed for the position of Principal of the Bell County Area Technology Center.  Eastern Kentucky University ("EKU") was one of the state institutions offering an alternative certification pathway for administrator certifications.  Gann was provided the eligibility letter from EKU, per 16 KAR 9:080 Section 8(3)(b), and therefore, was eligible to be interviewed and be offered the position of Principal at the Bell County Area Technology Center ("Bell County ATC").

6.  Once the Bell County School District ("District") verified he was the selected candidate and provided his start date in the position, the application was promptly submitted to EKU and the certification officer transitioned Gann to the alternative program and recommended him for certification to the Office of Educator Licensure and Effectiveness certification branch.

7.  From my review of both Bell BOE Bates documents and KDE Bates documents, the timeline is as follows:

    a.  On September 1, 2020, Gann is admitted to a TRADITIONAL principal program at EKU;

    b.  On October 9, 2020, EKU provided Gann with an alternative eligibility letter with this effective date.  The letter indicates he is eligible for Temporary Provisional certification if offered a principal position;

      c.    On October 14, 2020, e-mails were with Office of Career and Technical Education regarding whether Gann is an eligible candidate and can be interviewed for the position of Bell County ATC Principal;

      d.    On October 29, 2020, Gann e-mailed District representatives and requested materials related to the verification of employment section of the application for the Bell County ATC Principal.  Superintendent Tom Gambrel completes and signs the application, indicated a start date of November 9, 2020;

      e.    On November 9, 2020, Karen Dickens with EKU signs the recommendation for certification page on 11/9/2020.  This had the effect of exiting Gann from the TRADITIONAL program and admitting him to the ALTERNATIVE program effective 11/9/2020; and

      f.    On November 13, 2020, Gann's application was processed by the certification branch and issued with the effective date of November 9, 2020.

8.    Accordingly, it is my opinion Gann was eligible for hire when interviewed and when selected for the position as Bell County ATC Principal.

[R. 17-1, pp. 3–5].

Through their motion to strike, the Plaintiffs argue that the Board's disclosure of Hord "was untimely and failed to comply with Fed. R. Civ. P. 26(a)(2)(B)," and that, "[m]ore importantly, the witness is not qualified to provide opinions on statutory interpretation and is actually a fact witness that [the Board] failed to disclose."  [R. 23, p. 1].  In response, the Board argues that the disclosure was timely, that Hord is not a fact witness, that Hord's disclosure complies with Federal Rule of Evidence 702, and that "Plaintiffs' assertion that Hord impermissibly opines on matters of law mischaracterizes the substance of Hord's Declaration."  *See* [R. 30].  KDE argues in response that the Plaintiffs' motion is misplaced because the Plaintiffs had listed Hord as a potential witness in their answers to interrogatories.  *See* [R. 31].

As an initial matter, the Plaintiffs' argument that Hord is more properly characterized as a fact witness is persuasive.  *See* [R. 23, p. 5] ("Crystal Hord is a fact witness that Defendant failed to identify.  It cannot shoe in her testimony by disguising her as a legal expert.").  Indeed, a review of Hord's declaration demonstrates that she provides dates and descriptions of actions relating to Gann's efforts to obtain his Option 6 certification.  *See* [R. 17-1, ¶¶ 5–7].

Then, after Hord has provided a timeline of Gann's actions relating to pursuing Option 6 for his principal certification, she states, "Accordingly, it is my opinion Gann was eligible for hire when interviewed and when selected for the position as Bell County ATC Principal."  *Id.* at ¶ 8.  Although the Plaintiffs argue Paragraph 8 is improper opinion testimony or statutory interpretation, *see* [R. 23, pp. 3–5], the Court perceives Hord's statement to simply be a concluding thought that, because Gann *factually* had taken all the steps necessary, Option 6 was a viable pathway to him for certification.  True, the issue of whether Option 6 was a viable pathway for Gann to be certified is a matter of legal interpretation, which was for the Court to decide, as it did above.  But the Court does not understand Hord's offered testimony to be a matter of statutory or regulatory construction, as she simply explains the steps Gann took in relation to Option 6.

Moreover, even if Hord's statement that Gann was "eligible for hire" is properly considered as expert opinion testimony (which would subject it to the admissibility standards of Federal Rule of Evidence 702 and accompanying case law), the Court would not need to rely on it, as other evidence in the record demonstrates that Gann was eligible for hire and properly completed all steps for certification.[11]  *See* [R. 25-28].  Here, it bears repeating that the EPSB *did* issue Gann his Option 6 certificate.  *See id.*

---

[11] In its response to the Plaintiffs' motion to strike, the Board states "Hord will offer her expert opinion that Matthew Gann ('Gann') was qualified for the principal position at Bell County Area Technology Center ('ATC') when hired in October of 2020 as he was validly certified."  [R. 30, p. 2].  This differs from Hord's declaration, which only states that Gann was "eligible for hire" for the position.

Further, the Court observes that Hord's recitation of the factual timeline of Gann's actions in relation to Option 6 is largely corroborated by other evidence in the record, meaning the record supports that Gann took the necessary steps to meet the Option 6 criterion even without considering the contents of Hord's declaration.  For instance, emails show that Gann was informed of the process for eligibility for Option 6, *see* [R. 25-8], and that he enrolled in the appropriate classes at EKU, *see* [R. 25-21].  Then, Gann's letter of eligibility for Option 6 from EKU on October 9, 2020 states that he was "a candidate enrolled in a traditional route **Certificate in Instructional Leadership Program** at Eastern Kentucky University" and that, "if hired for the position of **School Principal, Mr. Gann** [met] our eligibility requirements for recommendation to the Kentucky Board of Education for a Temporary Provisional certificate through Option 6 Licensure."  [R. 25-22] (emphasis in original); *see also* [R. 23-1, p. 1] (email from Hord to Clark on October 14, 2020, stating that Gann "need[ed] to work with the university for them to transition him to the Option 6 principal program if he now has a job offer").  Additionally, Gann's certificate from the EPSB, effective November 9, 2020, states that he had "completed a program of professional preparation and [was] hereby issued this certificate in accordance with Section 161 of the Kentucky Revised Statutes and in accordance with the Legal Authority of the Kentucky Education Professional Standards Board."  [R. 25-28, p. 1].

Finally, even if the Court did rely on the factual content of Hord's declaration, any improper disclosure was harmless under Federal Rule of Civil Procedure 37.  Importantly, the Court observes that the Board has not argued that its disclosure of Hord as an *expert* witness satisfied its obligation to disclose her as a *fact* witness under Rule 26(a)(1).  The Court has no obligation to craft arguments for a party that it did not make; therefore, it will assume that the Board's disclosures were not compliant with Rule 26(a)(1)(A).

The Court thus turns to consider Rule 37, which governs non-compliance with Rule 26(a). *See Clark v. Louisville Jefferson Cnty. Metro Gov't*, No. 3:17-CV-419-GNS-CHL, 2023 WL 2316205, at *7 (W.D. Ky. Mar. 1, 2023) ("As set forth above, having found that Plaintiffs failed to timely disclose the [fact] witnesses at issue as required, the next question for the Court pursuant to Fed. R. Civ. P. 37(c) is whether the failure to timely disclose was substantially justified or harmless.").  Under Rule 37, "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1); *see also Clark*, 2023 WL 2316205, at *2 (quoting *Dickenson v. Cardiac & Thoracic Surgery of E. Tenn. P.C.*, 388 F.3d 976, 983 (6th Cir. 2004)) ("The exclusion of non-disclosed evidence is automatic and mandatory under Rule 37(c)(1) unless non-disclosure was justified or harmless.").

"The Sixth Circuit recognizes harmlessness as the key under Rule 37, not prejudice." *Eaton Corp. v. Angstrom Auto., Grp., LLC*, No. 1:20-CV-893, 2023 WL 5968005, at *2 (N.D. Ohio Sept. 14, 2023) (quoting *Sommer v. Davis*, 317 F.3d 686, 692 (6th Cir. 2003)) (cleaned up); *see also Anderson v. United States*, No. 1:20-CV-00157-GNS-HBB, 2023 WL 171776, at *8 (W.D. Ky. Jan. 12, 2023).  "Harmlessness means 'an honest mistake on the part of a party coupled with sufficient knowledge on the part of the other party.'"  *Eaton Corp.*, 2023 WL 5968005, at *2 (quoting *Howe v. City of Akron*, 801 F.3d 718, 747 (6th Cir. 2015)).

In determining whether the non-disclosure was substantially justified or harmless, the Sixth Circuit considers five factors:  "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing

- 29 -

party's explanation for its failure to disclose the evidence." *Howe*, 801 F.3d at 748 (quoting *Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 396–97 (4th Cir. 2014)); *see also Clark*, 2023 WL 2316205, at *2–3 (quoting *Howe*, 801 F.3d at 748).

 "The core goal of this evaluation is to separate honest, harmless mistakes from the type of underhanded gamesmanship that warrants the harsh remedy of exclusion." *Clark*, 2023 WL 2316205, at *3 (quoting *Bisig v. Time Warner Cable, Inc.*, 940 F.3d 205, 219 (6th Cir. 2019)) (cleaned up). Further, "[i]n lieu of exclusion, a court may also award reasonable expenses, including attorney's fees caused by the failure to disclose; inform the jury of the failure; or impose other appropriate sanctions including, but not limited to, treating facts as established for purposes of the action, prohibiting a party from introducing matters into evidence, striking pleadings, staying further proceedings, dismissing the action, rendering a default judgment, or treating the failure to disclose as contempt of court." *Id.* (citing Fed. R. Civ. P. 37(c)(1)).

Applying the *Howe* factors to this record, the Court finds the Board's non-disclosure of Hord as a fact witness may be excused under Rule 37(c)(1). First, there is little surprise to the Plaintiffs by the Board seeking to use Hord "to testify regarding the certification of Matthew Gann as it relates to this lawsuit" when the Plaintiffs themselves listed Hord as a potential witness in their responses to interrogatories. *See* [R. 31-1, p. 8] (Response to Interrog. No. 5); [R. 31-2, p. 9] (Response to Interrog. No. 5); *see generally Eaton Corp.*, 2023 WL 5968005, at *2 (noting plaintiff did not even claim surprise when it was undisputed plaintiff had known about witness and witness's relevant knowledge "from the beginning of [the] litigation" and when plaintiff had listed witness in supplemental initial disclosures). Indeed, regarding Hord, the Plaintiffs' responses to interrogatories read:

> Crystal Hord is the Branch Manager for KDE's Office of Educator Licensure and Effectiveness and has knowledge of the statutory, regulatory, and policy

requirements someone must possess in order to be a principal at an ACT as well as the requirements someone must comply with in order qualify for Option 6 and be hired as a principal. Ms. Hord may also have general knowledge of the allegations in the Complaint.

[R. 31-1, p. 8] (Response to Interrog. No. 5); [R. 31-2, p. 9] (Response to Interrog. No. 5). The Court thus perceives little harm to the Plaintiffs if the Board is able to call Hord as a fact witness to discuss the same topics that the Plaintiffs contemplated.

Moreover, multiple individuals testified during their fact depositions that any questions regarding certification should be asked of someone with the EPSB or Licensure, and the deposition testimony and other documentary evidence revealed that Hord was the individual at Licensure who had said Gann would be eligible if he completed the Option 6 pathway. *See, e.g.*, [R. 25-1]; [R. 25-2]; [R. 25-6]. In such a posture, the Court finds there can be little surprise to the Plaintiffs by the Board calling Hord as a *fact* witness.

Second, because there is little surprise to the Plaintiffs, there can be little surprise in need of curing. *Compare* [R. 17-1], *with* [R. 31-1, p. 8] (Response to Interrog. No. 5); [R. 31-2, p. 9] (Response to Interrog. No. 5); *see also Eaton Corp.*, 2023 WL 5968005, at *2 ("That Eaton chose to forego discovery opportunities – during the established discovery period or even after as agreed to by the parties – does not create the prejudice Eaton now asserts.").

The third and fourth factors can be considered together because, as will be explained below, the Plaintiffs have failed to point to evidence that demonstrates a genuine issue of material fact exists on the matter of pretext (and the dates provided in Hord's declaration are largely corroborated by other evidence of record, as just discussed). This means there is little concern that allowing the evidence would disrupt trial (a date for which has not even been set).[12] *See Eaton*

---

[12] Here, the Court observes that neither Defendant moved for summary judgment on Slusher's retaliation claim, and the parties have not made any arguments regarding the relevance of Hord's declaration to that claim.

*Corp*, 2023 WL 5968005, at *2 ("The absence of any surprise to Eaton, coupled with Eaton's opportunity to depose Dr. Khanfar again, strongly supports this Court's finding that allowing Dr. Khanfar to testify as to his expert opinions at trial will not be disruptive.  Additionally, no trial date will be set until after the Court rules on pending dispositive motions.").  Fifth, the Board implicitly admits that its disclosure did not fully comply with Rule 26 (albeit in terms of disclosing her as an *expert* witness).  *See* [R. 30, pp. 4–5].

Applying all the factors to the circumstances of this case, the Court finds the first factor— lack of surprise—drives the analysis and weighs heavily in favor of a finding that the non-compliant disclosure by the Board of Hord as a fact witness was substantially justified and was harmless to the Plaintiffs.  *See, e.g.*, *Eaton Corp.*, 2023 WL 5968005, at *3.  Accordingly, even if the Court considered the factual detail in Hord's declaration, the Board's failure to comply with its disclosure requirements was harmless under Rule 37.  The Plaintiffs' motion to strike will be denied.

### c.  Motions for Summary Judgment

#### 1.  Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When determining a motion for summary judgment, the Court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the nonmoving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009).  The Court may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 249 (1986).  The Court "need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

The initial burden of establishing that no genuine dispute of material fact exists rests with the moving party.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party satisfies this burden, the burden then shifts to the nonmoving party to produce "specific facts" showing a "genuine issue" for trial.  *Id.* at 324.  When, as here, a defendant moves for summary judgment, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Liberty Lobby*, 477 U.S. at 252.

Where "a party fails to support an assertion of fact or fails to properly address another party's assertion of fact," the Court may treat the fact as undisputed.  Fed. R. Civ. P. 56(e)(2).  A fact is "material" if the underlying substantive law identifies the fact as critical.  *See Liberty Lobby*, 477 U.S. at 248.  Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Id.*  "Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.*  A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Id.* at 249.

## 2.  Analysis

As a preliminary matter, neither KDE nor the Board moved for summary judgment on Slusher's retaliation claim in their initial motions.  *See* [R. 17] (KDE's motion fails to mention retaliation claim); [R. 19-1] (the Board's motion fails to mention retaliation claim); *see also* [R. 24, p. 1 n.1] (Plaintiffs' combined response to motions for summary judgment) ("Defendants do not move for summary judgment on Slusher's retaliation claim, thus, a jury must decide this

claim."). And although the Board requests summary judgment on that claim in its reply brief, *see* [R. 34, p.4], such a request comes too late for consideration with the present motion.

To be sure, "[i]t is well settled that a movant cannot raise new issues for the first time in a reply brief because consideration of such issues deprives the non-moving party of its opportunity to address the new arguments." *Hickman v. Sloan Fluid Accessories, Inc.,* 833 F. Supp. 2d 822, 828 (E.D. Tenn. 2011) (internal quotation marks omitted); *see also Eusner v. Sullivan*, No. 5:21-CV-00074-GFVT-MAS, 2023 WL 2815350, at *5 (E.D. Ky. Apr. 5, 2023), *reconsideration denied sub nom. Eusner v. Ellis Sullivan*, No. 5:21-CV-00074-GFVT-MAS, 2023 WL 3326100 (E.D. Ky. May 9, 2023) ("Because Mr. Eusner and Ms. Sullivan provide argument on the declaratory judgment claim only in their reply briefs, the arguments are waived."); *cf. Schneider v. Qualters*, 852 F.2d 569, at *7–8 (6th Cir. 1988) (Table) (finding district court did not err by granting summary judgment on claim where defendant first presented argument in reply brief because the claim relied on the same theory as another claim the plaintiff had addressed so plaintiff was on notice of and had had an opportunity to respond to defendant's arguments). Therefore, Slusher's retaliation claim survives the present motions for summary judgment; however, the Court will allow the parties an opportunity to file an apt motion regarding that claim, if necessary, as discussed below. For now, the Court only discusses the merits of the claims upon which the Defendants *do* seek summary judgment: the Plaintiffs' sex and age discrimination claims.

Although brought under different statutes (Title VII and ADEA under federal law and KCRA under Kentucky law), the Plaintiffs' discrimination claims follow a similar structure. In this case, the Plaintiffs do not base their claims on direct evidence of discrimination. *See, e.g.*, [R. 24, p. 18] ("Where, as here, a plaintiff offers only indirect evidence of discrimination, she may establish a prima facie case under Title VII or the ADEA by showing . . . ."). For example, they

have not highlighted any comment or documentation that references their sex or age as being a consideration for why they were not offered the principal job.  *See, e.g.*, *Mick v. Four Rivers Nuclear P'ship, LLC*, No. 5:20-CV-072-TBR, 2022 WL 609156, at *4 (W.D. Ky. Mar. 1, 2022) ("In the context of an ADEA discrimination claim, the Sixth Circuit has defined direct evidence as 'evidence that proves the existence of a fact without requiring any inferences.'  For example, an employer's comment that an employee should retire because 'they just want somebody younger' is direct evidence of age discrimination.") (internal citation omitted); *cf. Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 650 (6th Cir. 2012) ("Ondricko asserts she presented direct evidence of race discrimination based on O'Connor's statement to Hannon: '[D]o you think I wanted to fire Kim, I didn't want to fire Kim, how can I keep the white girl.'").  The Court thus views their discrimination claims as being based on indirect evidence and will apply the familiar *McDonnell Douglas* burden-shifting framework to their claims.  *See Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 606 (6th Cir. 2019) ("A plaintiff may show discrimination by direct evidence, or a plaintiff lacking direct evidence of discrimination may succeed on a Title VII claim by presenting indirect evidence under the framework first set forth in *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802–03 (1973).") (cleaned up); *see also McDonnell Douglas,* 411 U.S. 792, *as subsequently modified by Texas Dep't of Comm. Affairs v. Burdine,* 450 U.S. 248 (1981); *Flowers v. WestRock Servs., Inc.*, 979 F.3d 1127, 1130 (6th Cir. 2020) ("To demonstrate an ADEA violation, a plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial) that age was the 'but-for' cause of the challenged employer decision.  Because Flowers relies on circumstantial evidence to advance his claim, we proceed under a burden-shifting framework.") (cleaned up)

For a Title VII claim (and a KCRA claim for sex discrimination) based on circumstantial evidence, "a plaintiff must first establish a prima facie case of discrimination, the elements of which vary slightly depending on the theory asserted." *Philbrick v. Holder*, 583 F. App'x 478, 482 (6th Cir. 2014); *see also Taylor v. Ingham Cnty. 30th Jud. Cir. Ct.*, No. 23-1685, 2024 WL 3217590, at *3 (6th Cir. June 27, 2024) ("In a failure to promote employment discrimination case, the Sixth Circuit has modified the elements of the test to fit the specific context.") (internal quotation marks omitted); *Beatty v. Frito-Lay, Inc.*, 429 F. Supp. 3d 342, 347 (E.D. Ky. 2019) (citing *Smith v. Leggett Wire Co.*, 220 F.3d 752, 758 (6th Cir. 2000)) ("The Kentucky Civil Rights Act, K.R.S. § 344.040, mirrors Title VII of the Civil Rights Act of 1964, and discrimination claims brought under the KCRA are analyzed the same way as those brought under Title VII.").

To establish a prima facie case under a failure-to-hire theory under Title VII, a plaintiff must show that: (1) she was a member of a protected class; (2) she applied for and was qualified for the position; (3) she was considered for and denied the position; and (4) she was rejected in favor of another person with similar qualifications who was not a member of her protected class. *See Anderson v. Haworth, Inc.*, No. 17-1446, 2017 WL 8897094, at *2 (6th Cir. Dec. 20, 2017); *see also Taylor*, 2024 WL 3217590, at *3 (discussing failure-to-promote theory). "Alternatively, a plaintiff may satisfy the fourth element in a disparate-treatment case by showing that she was treated differently than a similarly-situated employee outside of the plaintiff's protected class." *Haworth*, 2017 WL 8897094, at *2 (internal quotation marks omitted). "Once the plaintiff satisfies the elements of a prima facie case, the burden shifts to the defendant to 'articulate some legitimate, nondiscriminatory reason' for its actions." *Taylor*, 2024 WL 3217590, at *3 (cleaned up). "If the defendant meets its burden, the burden shifts back to the plaintiff to demonstrate that the proffered reason was not the true reason for the adverse action." *Id.*

For an ADEA claim (and KCRA claim for age discrimination) based on circumstantial evidence, the same burden-shifting framework applies. *See Flowers,* 979 F.3d at 1130; *see also Highfield v. City of Vanceburg*, 643 F. Supp. 3d 706, 716 (E.D. Ky. 2022) ("The same legal analysis applies to both the ADEA and KCRA, and courts can analyze claims brought under both statutes simultaneously."). For an ADEA failure-to-hire claim, a plaintiff must establish a prima facie case of discrimination by proving: that (1) she is a member of a protected class; (2) she was subject to an adverse employment decision, namely, that she applied for and did not receive the jobs at issue; (3) she was qualified for the position; and (4) similarly situated persons not in her class received the job for which she applied. *See Mick*, 2022 WL 609156, at *5; *see also Flowers*, 979 (stating prima facie case in failure-to-hire claim as requiring a plaintiff to show that: (1) she was at least 40 years old at the time of the alleged discrimination; (2) she was subjected to an adverse employment action; (3) she was otherwise qualified for the position; and (4) she was replaced by a younger worker); *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 812–13 (6th Cir. 2011) (failure-to-promote claim); *Grosjean v. First Energy Corp.*, 349 F.3d 332, 336 (6th Cir. 2003) ("In age discrimination cases, the protected class includes all workers at least 40 years old and the fourth element is modified to require replacement not by a person outside the protected class, but merely replacement by a significantly younger person."). A plaintiff "must prove all four elements," but "this light burden is easily met and not onerous." *Mick*, 2022 WL 609156, at *5 (cleaned up).

If the plaintiff carries the initial burden of establishing a prima facie case of age discrimination, the burden shifts to the defendant to provide a legitimate, non-discriminatory reason for its actions. *See Flowers*, 979 F.3d at 1130. If the defendant meets its burden, the plaintiff must then show that the defendant's explanation was not the true reason for the

employment decision.  *See id.*  "Put another way, [the plaintiff] must show it is more likely than not that [the defendant's] proffered reason is false and instead is pretext for discrimination."  *Id.*

For both discrimination claims, the Plaintiffs may demonstrate pretext in several ways.  As the Sixth Circuit has explained:

> A plaintiff may demonstrate that an employer's proffered reason is pretextual by showing that it (1) has no basis in fact, (2) did not actually motivate the challenged conduct, or (3) was insufficient to warrant the challenged conduct.  Regardless of which option is used, the plaintiff retains the ultimate burden of producing sufficient evidence from which the jury could reasonably reject the defendants' explanation and infer that the defendants intentionally discriminated against him.  If the plaintiff creates only a weak issue of fact as to whether the employer's reason was untrue and there is abundant and uncontroverted independent evidence that no discrimination occurred, the employer is entitled to summary judgment.

*Taylor*, 2024 WL 3217590, at *4 (cleaned up); *Flowers*, 979 F.3d at 1133 (explaining plaintiff can show pretext by showing offered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct).  "But these are not the only ways that a plaintiff can establish pretext; these three categories are simply a convenient way of marshaling evidence and focusing it on the ultimate inquiry: did the employer [fail to hire] the employee for the stated reason or not?"  *Wynn v. Univ. of Toledo*, No. 3:22 CV 1899, 2024 WL 2882112, at *7 (N.D. Ohio June 7, 2024) (internal quotation marks omitted).  For example, "in a failure-to-hire claim such as this, [a p]laintiff may prove pretext through the relative-qualifications test."  *Aday v. Westfield Ins. Co.*, No. 21-3115, 2022 WL 203327, at *5 (6th Cir. Jan. 24, 2022) (ADEA claim); *see also Taylor*, 2024 3217590, at *5 (Title VII claim).

The Defendants do not meaningfully, if at all, dispute that the Plaintiffs can satisfy the prima facie case for their sex and age discrimination claims.  *See* [R. 17, p. 5] (KDE's motion for summary judgment) ("For the purposes of this Summary Judgment motion only, the Defendant does not dispute that the Plaintiffs are able to establish prima facie elements of gender and age

discrimination."); [R. 19-1, p. 8] (the Board's motion for summary judgment) (Discussing age discrimination claim: "In the present case, even assuming the Plaintiffs can establish a prima facie case, the evidence demonstrates they were not hired for the position based on a legitimate, nondiscriminatory reason.").[13]   Instead, the Defendants argue that they had legitimate, non-discriminatory reasons for choosing to hire Gann for the principal position over the Plaintiffs.   The Court finds it easiest to quote from the Defendants' briefing for these proffered reasons.

First, KDE represents that, based on information known to it:

Gann had a clear vision for Bell County ATC improvement.  He set forth specific examples of things he wanted to change.  He also voiced a desire to focus on industry certifications for all students and was knowledgeable on various programs' approved certifications.  Gann noted that he wanted to work with community members and get the community involved in making improvements and setting goals for the ATC.  Gann also had more leadership experience with career and technical education (CTE) by serving as the CTE Coordinator for his district.  In this capacity, he was responsible for entering all the data into the Technical Education Database System (TEDS) for the various CTE programs at Bell County High School, as well as being responsible for the Federal Perkins Grant.  Mr. Gann also served on a district school restructuring committee and served as the department head for his district.  Overall, Gann was chosen based on responses during the interview, past leadership experience, and an articulated vision and goals for the future success of the ATC.

[R. 17, p. 6] (citing KDE's Response to Interrog. No. 3, *see* [R. 25-26, pp. 2–3]).  KDE also points to the testimony of its employee Marth:

A. . . . We liked what [Gann] had to say about his vision for the school, and seeing it be more in the eye of the public.  And making it more rigorous.  I know I used that word before.  But just making sure that standards are being taught and that -- to increase industry certification.  He wanted to grow the school.

---

[13] The Board's reply states in one heading that "Plaintiffs cannot establish a prima facie case of discrimination," but then jumps to arguing that the Board had legitimate, non-discriminatory reasons for choosing Gann that were not pretextual.  *See* [R. 34, pp. 4–6].  In such a posture, the Court views any argument by the Board that the Plaintiffs have failed to satisfy a prima facie case as wholly undeveloped.  *Cf. See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones.") (cleaned up).  Even so, the Court finds the Plaintiffs *have*, on this record, satisfied a prima facie case for their respective discrimination claims.

Q. Anything else?

A. Not specifically.  I just -- I just remember being taken back by he had a really clear, good -- just good vision of where the center could go.

Q. And what was that vision?  Can you explain that further for me?

A. Well, like I said, I mean, in addition to what I said, I guess, you know, he also mentioned bringing it down to the middle school, getting middle school students involved to increase and help with enrollment, which is always important with ATCs.

Q. And what do you mean by getting the middle school involved?  Just going over and talking to the middle school students about the program?

A. Not just talking to them.  I mean, he talked about bringing them up there, doing different things with the middle school.  There were several different ideas he had with them.  And then he also mentioned getting the programs more out into the public.  And, like, with -- maybe like social media and different things.  And helping -- just kind of put a spotlight on the ATC instead of it being a hidden treasure, you know, like putting a spotlight on it.

Q. Okay.  What about weaknesses?  Did he have any weaknesses?

A. I mean, I don't think we really had any strong weaknesses as far as the interview went.  The Option 6 [certification] thing we both were -- you know, after we realized that that was a legit pathway, EPSB approved it, then we were -- we kind of just put that to the side in our thinking.

*Id.* (quoting [R. 17-2, p. 29 (112:8–113:21)]).

Similarly, the Board offers that:

Gann had been a Career and Technical Education ("CTE") Coordinator for the District (i.e., department head for all CTE courses), entered all District data related to student industry certifications into the Technical Education Database ("TED"), and [led] the District Perkins performance plan, which involves obtaining federal grant money for the betterment of CTE programs in Bell County, Kentucky.  In addition, Gann was able to articulate a clear vision for the Bell County ATC, making it more rigorous, getting middle school students involved to increase enrollment, and getting the programs out in the public.  Overall, Gann provided a more compelling approach to leadership than the other candidates.

. . .

[T]he determination to select Gann was based on the legitimate determination that Gann was more impressive during his interview than Redmond and Slusher. During Gann's interview, Gambrel was impressed with Gann's desire to spend time in the classroom observing and assisting with teaching methods as well as his intent to promote a more rigorous learning environment where teachers taught every day instead of having a day for parties and group activities.

With regard to Redmond, Gambrel testified he was not impressed with Redmond's answer on why she wanted to be a principal. She basically indicated she wanted to be a principal because she had always wanted to be and "there's 'nothing astounding' about that." In addition, with respect to the question regarding what Redmond would expect to see in an exemplary career and technical education classroom, Redmond responded with "organized chaos." Gambrel testified he did not feel organized chaos was a good teaching method.

In her interview, Gambrel testified Redmond did not have a good grasp of instructional strategies or instructional standards outside of the nursing program. This was one of the main reasons Gambrel did not select her as Principal. "[S]he knew the nursing program . . . [but] didn't know much about the rest of the building or the rest of the program," and as such, her knowledge was limited in that respect. Gambrel stated Redmond also failed to demonstrate knowledge of effective discipline procedures or project a positive attitude towards promoting the ATC's programs within the community.

With respect to Slusher, Gambrel stated he was somewhat "put off" by Slusher's name-dropping of the individuals she knew at KDE and the Board. Ultimately, Gambrel testified he did not believe Slusher had a good interview.

[R. 19-1, p. 10] (internal record citations omitted).

Importantly, "the Court will not second-guess a non-discriminatory reason even if the employer's hiring process was entirely subjective." *Mick*, 2022 WL 609156, at *6 (cleaned up). Considering the Defendants' proffered reasons, the Court finds they have carried their burden and have offered legitimate, non-discriminatory reasons for selecting Gann. *See Taylor*, 2024 WL 3217590, at *4 (collecting cases on legitimate non-discriminatory reasons); *see also Provenzano*, 663 F.3d at 815 ("In Hall's deposition and affidavit, she gave a detailed description of Babcock's performance-related attributes and Provenzano's performance-related deficiencies. The district court properly found that LCI met its burden of production at this second stage of the *McDonnell*

- 41 -

*Douglas* analysis."); *Aday*, 2022 WL 203327, at *5.  The burden therefore shifts back to the

Plaintiffs to show that the reasons offered by the Defendants are pretextual.  *See Taylor*, 2024 WL

3217590, at *34.

To demonstrate pretext, the Plaintiffs rely on the "relative-qualifications" test.  *See* [R. 24,

p. 19].  Here, the Sixth Circuit has explained that:

> Relative qualifications establish triable issues of fact as to pretext where the
> evidence shows that either (1) the plaintiff was a plainly superior candidate, such
> that no reasonable employer would have chosen the latter applicant over the former,
> or (2) plaintiff was as qualified as if not better qualified than the successful
> applicant, and the record contains other probative evidence of discrimination.

*Provenzano*, 663 F.3d at 815 (ADEA case) (cleaned up); *Taylor*, 2024 WL 3217590, at *5 (Title

VII case).  Still, as stated above, the different ways a plaintiff can seek to establish pretext "are

simply a convenient way of marshaling evidence and focusing it on the ultimate inquiry: did the

employer [fail to hire] the employee for the stated reason or not?"  *Wynn*, 2024 WL 2882112, at

*7.

Thus, regardless of which method a plaintiff employs to show pretext, she "retains the

ultimate burden of producing sufficient evidence from which the jury could reasonably reject the

defendant's explanation and infer that the defendant intentionally discriminated against [her]."

*Mick*, 2022 WL 609156, at *7 (cleaned up).    To survive summary judgment, then, the plaintiffs

"need only proffer enough evidence from which a reasonable jury could reject [the Defendants']

articulated reasons."  *Id.* (internal quotation marks omitted).  "In essence," they must demonstrate

that the Defendants' "business decision was so lacking in merit as to call into question its

genuineness."  *Id.* (internal quotation marks omitted).

Before discussing the different theories under the relative-qualifications test, the Court

pauses "to note that employers are generally free to choose among qualified candidates."  *Id.*

(internal quotation marks omitted). "Furthermore, the law does not require employers to make perfect decisions, nor forbid them from making decisions that others may disagree with." *Id.* (internal quotation marks omitted). This means that "a rejected applicant must show that a reasonable jury could conclude that the actual reasons offered by the defendant were a mere pretext for unlawful age [and sex] discrimination, not that other reasonable decision-makers might have [hired] the plaintiff." *Id.* (cleaned up). To quote the Court in *Mick*:

> The Sixth Circuit has provided additional guidance on the use of qualifications evidence (i.e., the relative-qualifications test) to determine pretext:
>
>> Whether qualifications evidence will be sufficient to raise a question of fact as to pretext will depend on whether a plaintiff presents other evidence of discrimination. In the case in which a plaintiff does provide other probative evidence of discrimination, that evidence, taken together with evidence that the plaintiff was as qualified or better qualified that the successful applicant, might well result in the plaintiff's claims surviving summary judgment.
>
> [*Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 626–27 (6th Cir. 2006)] (citation omitted). However, if there "is little or no other probative evidence of discrimination, to survive summary judgment the rejected applicant's qualifications must be so significantly better than the successful applicant's qualifications that no reasonable employer would have chosen the latter applicant over the former." *Id.* at 627. Stated another way, "evidence that a rejected applicant was as qualified or marginally more qualified than the successful candidate is insufficient, in and of itself, to raise a genuine issue of fact that the employer's proffered legitimate, non-discriminatory rationale was pretextual." *Id.* Thus, "when qualifications evidence is all (or nearly all) that a plaintiff proffers to show pretext, the evidence must be of sufficient significance itself to call into question the honesty of the employer's explanation." *Id.* "A laxer standard would move this court from its proper role of preventing unlawful employment practices to the illegitimate role of acting as a 'super personnel department,' overseeing and second guessing employers' business decisions." *Id.* (quoting *Verniero v. Air Force Acad. Sch. Dist. No. 20*, 705 F.2d 388, 390 (10th Cir. 1983)).

*Id.*

With these principles in mind, the Court first considers whether the Plaintiffs' qualifications were plainly superior to Gann's. *See id.* at *8; *see also Aday*, 2022 WL 203327, at

*5 ("To prove that he was the plainly superior candidate, Plaintiff must objectively demonstrate his superior qualifications.") (internal citations omitted).  Here, the Plaintiffs argue they were the plainly superior candidates because they each had more teaching experience than Gann and their Rank 1 certifications when Gann did not, and while there were questions surrounding whether Gann could be properly certified for the principal position, there was no doubt about their eligibility for the position because they did have principal certifications.  *See* [R. 24, pp. 19–20].  Additionally, Slusher had her doctorate, when Gann did not.  *See* [R. 25-13, p. 4].

But the record shows Gann, who had taught business for nine years at Bell County High School, had other experience that the Plaintiffs did not, including having served as the CTE coordinator and TEDS coordinator and handling the Perkins grant application. *See* [R. 25-9, pp. 6–8 (20–29)]; *see also* [R. 25-1, p. 14 (53)] (Marth testifying that Gann's role as CTE coordinator was relevant leadership experience).  Further, as discussed above as a legal matter, Option 6 was a viable pathway for Gann to obtain his principal certification.  *See supra* § II(a).  And it also was available to him as a factual matter, given that he took the steps necessary to enroll in the alternative program at EKU and obtain the relevant documentation as required by Kentucky law, which resulted in the EPSB ultimately issuing his certificate through that route.  *See, e.g.*, [R. 25-22, p. 1] ("**Mr. Matthew Gann** is a candidate enrolled in a traditional route **Certificate in Instructional Leadership Program** at Eastern Kentucky University.  At this time, if hired for the position of **School Principal, Mr. Gann** meets our eligibility requirements for recommendation to the Kentucky Board of Education for a Temporary Provisional certificate through Option 6 licensure.") (emphasis in original); [R. 25-28, p. 2] ("This certifies that Matthew Aaron Gann has completed a program of professional preparation and is hereby issued this certificate in accordance

with Section 161 of the Kentucky Revised Statues and in accordance with the legal authority of the Kentucky Education Professional Standards Board.").

A review of the case law demonstrates that it is an exceptionally high bar for a plaintiff to succeed on a "plainly superior candidate theory." *See Taylor*, 2024 WL 3217590, at *5; *see also Aday*, 2022 WL 203327, at *6 ("The Sixth Circuit has created an exceptionally high standard for satisfying the burden of proving a plaintiff is the plainly superior candidate."). Indeed, "[i]f two reasonable decisionmakers could consider the candidates' qualifications and arrive at opposite conclusions as to who is more qualified, then clearly one candidate's qualifications are not significantly better than the others." *Taylor*, 2024 WL 3217590, at *5 (quoting *Aday*, 2022 WL 203327, at *5). Although the Plaintiffs have pointed to evidence that they had more experience or education in certain respects than Gann, the Court finds they are unable to clear the high threshold required for this first theory. *See Mick*, 2022 WL 609156, at *8 ("Having compared Plaintiff's qualifications with those of the selected applicants, the Court finds that a reasonable decisionmaker could plausibly select Plaintiff over the other applicants. . . . However, another reasonable decisionmaker could also make a plausible case that the selected applicants were the better candidates for the SPO positions.").

Still, Redmond and Slusher may prove pretext under the second theory under the relative-qualifications test if they can show that (1) each was as qualified as if not better qualified than Gann, and (2) the record contains other probative evidence of discrimination. *See Aday*, 2022 WL 203327, at *9; *see also Taylor*, 2024 WL 3217590, at *6 ("Without a showing of other probative evidence of discrimination, however, evidence that a rejected applicant was as qualified or marginally more qualified than the successful candidate is insufficient, in and of itself, to raise a genuine issue of fact that the employer's proffered legitimate, non-discriminatory rationale was

pretextual.") (cleaned up).  "A more searching evaluation of the relative qualifications of the two candidates is conducted at this stage than was required at the fourth prong of the prima facie case." *Provenzano*, 663 F.3d at 816 (discussing ADEA claim).  Additionally, the Sixth Circuit has directed that, when selecting a candidate for a management position, "an employer has even greater flexibility with its choice."  *Taylor*, 2024 WL 3217590, at *6; *see also Igwe v. Salvation Army*, 790 F. App'x 28, 35 (6th Cir. 2019) ("As we have long held, so long as its reasons are not discriminatory, an employer is free to choose among qualified candidates when making hiring decisions.") (cleaned up).

First, the Court recognizes that the inquiry into qualifications is more searching at this stage than at the prima facie case, but still finds the Plaintiffs can clear the bar.  *See Provenzano*, 663 F.3d at 816.  For one, the Plaintiffs had more years of teaching experience than Gann.  *Compare* [R. 25-11] and [R. 25-13], *with* [R. 25-14].  Indeed, Redmond served as a health science instructor at the Bell County ATC for more than 25 years, and Slusher had taught for more than 15 years, including most recently teaching high school business and science in Laurel County.  *See* [R. 25-11, p. 4]; *see also* [R. 1, ¶ 17]; *see also* [R. 25-13, p. 5].  By comparison, Gann had been teaching business for nine years.  *See* [R. 1, ¶ 18]; *see also* [R. 15-14, p. 5].  For another, Marth admitted that Gann's application was not on equal footing with the Plaintiffs', at least on paper, because he had not completed any coursework toward his Rank 1 certification, and the Plaintiffs each had already obtained their Rank 1s.  *See* [R. 25-1, p. 17 (65:1–7)].

With evidence in the record that one of the decision makers in the hiring process for the ATC principal position acknowledged that, at least on paper, the Plaintiffs had an edge over Gann, the Court finds the Plaintiffs have proffered sufficient evidence to convince a reasonable juror that each "was as qualified" as Gann for the ATC principal position.  *See Aday*, 2022 WL 203327, at

*9 ("Surely, Plaintiff's application had shortcomings that Somogyi's and Zito's applications did not (and some strengths Somogyi and Zito did not have), but the question is not whether he was the best candidate.  Instead, Plaintiff must merely create a genuine dispute as to whether he was 'as qualified' as Somogyi and Zito. . . . [Here], the district court correctly concluded that Plaintiff has proffered enough evidence from which a jury could conclude he was at least as qualified as Somogyi and Zito.").

Second, what qualifies as other probative evidence of discrimination is hard to quantify. Indeed, a review of the case law indicates that other probative evidence of discrimination is a high standard and is, in many regards, nearly akin to direct evidence of discrimination.  *See Romano v. Hudson City Sch. Dist.*, 772 F. App'x 258, 267 (6th Cir. 2019) ("We agree that there is no probative evidence of discrimination.  Each interviewer from round two averred that they were unaware of Romano's age at the time of the interview, and not one interviewer stated that age was a consideration.  Romano has not rebutted this evidence, and nothing else in the record supports a finding of discrimination."); *see also Mick*, 2022 WL 609156, at *9 ("However, as noted above, a plaintiff's age discrimination claim may survive summary judgment even if he was only as qualified or marginally better qualified than the successful applicants, so long as he provides other probative evidence of discrimination.  For example, 'age-based slurs may well betray a bias that older workers are less valuable or competent.'  In *Willard v. Huntington Ford, Inc.*, for instance, the Sixth Circuit found evidence of pretext when a decisionmaker told the plaintiff that he was 'old and fat,' 'over-the-hill,' and referred to him as a 'dinosaur' and 'grandpa.'  However, even these types of 'age-based slurs' do not necessarily constitute direct evidence of age discrimination.  Comments made several months prior to the adverse employment action, which were unrelated to that action or were directed toward another employee, or were not made by a

decision maker, may not be sufficient to demonstrate age discrimination.") (internal quotation marks omitted).

For example, in *Aday*, the court found statements that had been made to a plaintiff including "[T]his one is up," when discussing who would retire next, and "[E]veryone thinks it's time for you to put up your piggies," were sufficiently probative of discrimination to allow the plaintiff's age discrimination claim to reach a jury under a relative-qualifications theory of pretext. *See Aday*, 2022 WL 203327, at \*10–11. The record does not reveal any discriminatory statements (regarding age or sex) having been made to (or about) the Plaintiffs in this case, so the Court considers if any of the other circumstances of the application and interview process for the Bell County ATC principal position provide probative evidence of discrimination.

In this context, the Plaintiffs argue that "[p]reeminent here is that Defendants have proffered false reasons for not selecting Redmond and Slusher" and that the "Defendants' put forth varying reasons for not hiring Slusher or Redmond over Gann" but [t]he specific reasons Defendants relied upon are easily shown to be untrue." [R. 24, p. 20]. But having extensively considered the record, the Court finds that the Plaintiffs' arguments regarding other probative evidence of discrimination are unpersuasive.

First, the Plaintiffs argue that they, like Gann, had expressed a vision and goals for the ATC, that they also had relevant leadership experience, that Redmond clearly had knowledge about the ATC based on her years of experience, and that Slusher did not name drop during her interview. *See id.* at 20–23. However, and crucially to their ability to survive summary judgment on their discrimination claims, the Plaintiffs' own subjective views of their qualifications as compared to Gann are insufficient to demonstrate pretext. *See Briggs v. Potter*, 463 F.3d 507, 516

(6th Cir. 2006) ("Briggs's subjective view of his qualifications in relation to those of the other applicants, without more, cannot sustain a claim of discrimination.").

Second, and in the same way, the Plaintiffs' subjective perceptions that Gambrel was rushed and dismissive and played with his phone during the interview or that he lacked the ability to judge their answers when there is evidence that he himself did not understand certain programs or operations at the ATC are, without more, insufficient to demonstrate pretext. *See Jones v. DeJoy*, No. 20-CV-12006, 2021 WL 4034234, at *5 (E.D. Mich. Sept. 3, 2021), *aff'd*, No. 21-1608, 2022 WL 6228433 (6th Cir. Aug. 22, 2022) ("She believed that the comments were racially motivated because of '[j]ust the way [Thompson] said it' and because Thompson chose to have the conversation in private with 'no witnesses.' The subjective perception that Thompson's comments were based on racial animus cannot establish pretext.") (internal record citation omitted); *see also Aday*, 2022 WL 203327, at *12 (explaining that the plaintiff's claims that the interviewer misunderstood his presentation did not "suggest [the defendants'] decision to hire [another candidate] had no basis in fact").

Third, the Plaintiffs point to the circumstances surrounding Gann being hired for the teacher position in 2011 when he did not hold the proper certifications and the state's subsequent reprimand of the situation as establishing other probative evidence of discrimination. *See* [R. 24, p. 2]; *see also* [R. 25-3].  But the Plaintiffs have not shown that the same decision makers involved in the selection process for the Bell County ATC principal position, namely Marth and Gambrel, also made the decision in that instance.[14]  Indeed, the OEA opinion references Superintendent George Thompson as having improperly filled the teaching position. *See* [R. 25-3, p. 1].

---

[14] The same is true to the extent the Plaintiffs rely on their own prior attempts or desire to apply for principal positions.

This brings the Court to other evidence in the record, which cuts against any inferences of discrimination. First, the Court must observe that Marth *and* Gambrel both agreed that Gann should not be interviewed if he did not meet the certification requirements but were assured by Licensure's statement that Option 6 was a viable pathway if Gann completed the appropriate steps, *see* [R. 23-1]. They also unanimously agreed Gann was the better candidate following his interview. Indeed, Marth and Gambrel specifically relied on the responses Gann gave during his interviews as distinguishing him as the superior candidate, including the vision and goals he offered for the Bell County ATC, and they testified to Gann's detailed and rigorous plans for the technical high school. *See* [R. 25-1, p. 29 (112:8–14)].

By contrast, Marth could not recall any particulars of Slusher's strengths or weaknesses, and Gambrel thought Slusher's interview was "not impressive." *Id.* at 37–38 (145:25–146:4); [R. 25-6, pp. 23, 24, 28 (89:6–11, 91:12–15, 107:8)]. Similarly, regarding Redmond, Gambrel thought "organized chaos" would not describe an exemplary classroom and her response that she wanted to be principal because she had always wanted to be principal were not strong interview responses. *See* [R. 25-6, pp. 24–25 (93:11–14, 96–97)]. Courts have found such circumstances to weigh *against* a finding of discrimination. *See Wynn*, 2024 WL 2882112, at *7 ("Based on the evidence presented, Plaintiff has failed to show Defendant's legitimate, non-discriminatory reasons for promoting Ziviski over Plaintiff were pretextual. The evidence shows the committee's decision was based on Ziviski's qualifications, including her law degree and broader experience. Notably, none of the search committee members voted for Plaintiff.").

Second, the Court must observe that Marth was a female and over the age of 40 at the time the interviews occurred. That she was in both of the same classes as the Plaintiffs on which they base their discrimination claims also cuts against a finding of discrimination. *See Carpenter v.*

*Renfro Valley, LLC*, No. CIV. 12-82-GFVT, 2015 WL 893582, at *9 (E.D. Ky. Mar. 2, 2015) ("The best evidence that Plaintiffs have to tie their terminations to age and gender is that both were replaced by younger men. Even this argument is substantially weakened when one considers that Kidd is a female over the age of 40, that many of Carpenter's duties were given to Jackie Morris who is a female over the age of 40, and that the younger man who was hired to take over for Carpenter was subsequently terminated for 'not doing his job' and was replaced by a female, Emily Bullock.").

Finally, to the extent the Plaintiffs rely on a "general pretext" test, they are unable to succeed. *See Aday*, 2022 WL 203327, at *11 ("For Plaintiff to prove that Defendants' articulated nondiscriminatory explanations are pretextual, he must prove that they (1) have no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) were insufficient to warrant the challenged conduct.") (cleaned up); *see also* [R. 24, p. 19] ("[T]he purported reasons for selecting Gann over Redmond and Slusher are not supported by the record, are riddled with factual inaccuracies, and raise a genuine issue of material fact as to whether they are pretextual."). For one, as just discussed, the Plaintiffs' subjective perceptions regarding how their qualifications or interviews compared to Gann's are insufficient to demonstrate pretext.

For another, that the Plaintiffs believe they also provided a vision or goals for the ATC does not challenge the Defendants' position that *Gann's* offered goals and vision were more impressive. *See Aday*, 2022 WL 203327, at *12 ("Lilly stated that she believed Zito presented a 'more creative' plan for the position, specifically noting his intention to use 'webinars' instead of travelling to his direct reports three times per month. Plaintiff claims Lilly misunderstood his presentation, that he did not plan to travel three times per month to visit his direct reports, and that the use of technology and 'webinars' to connect with the direct reports was not creative. None of

these arguments suggest Defendants' decision to hire Zito had no basis in fact.  Surely, if Plaintiff gave a presentation that left the hiring manager with the impression he would frequently travel and would rely less on technology than the other candidates, that is either his fault or the fault of the hiring manager's lack of comprehension.  In either event, Plaintiff has again not cast any doubt on the veracity of Lilly's explanation.").  Stated another way, even if the Plaintiffs had been able to cast some doubt on the Defendants' articulated reasons for not hiring them, they have not cast any doubt on the Defendants' subjective beliefs that Gann had a better interview and offered a clear vision and goals for the Bell County ATC.  Because these are both nondiscriminatory bases for choosing to hire Gann over them, the Plaintiffs have not shown that a genuine dispute of material fact exists under the general pretext test.  *See id.*

The Defendants' motions for summary judgment will be granted.

### III.    Conclusion

For the foregoing reasons, and with the Court being otherwise sufficiently advised,

**IT IS HEREBY ORDERED** as follows:

1.  KDE's Motion for Summary Judgment **[R. 17]** is **GRANTED.**

2.  The Board's Motion for Summary Judgment **[R. 19]** is **GRANTED.**

3.  The Plaintiffs' Motion to Strike **[R. 23]** is **DENIED**.

4.  The Plaintiffs' Motion for Oral Argument **[R. 36]** is **DENIED as moot.**

5.  Within **thirty (30) days** of the entry of this Memorandum Opinion and Order, the parties **SHALL** confer and file a joint status report advising as to whether the Court's analysis herein has any effect on the remaining retaliation claim and whether they wish to file a motion addressing such effect, or whether they wish to proceed to trial on that claim. If the parties wish to file an apt motion regarding the retaliation claim, they shall

include in their joint status report a proposed briefing schedule. If the parties wish to instead proceed to trial on the retaliation claim, they shall include in their joint status report three dates between April 1, 2025 and June 30, 2025 when this matter can be scheduled for trial, and the anticipated length of trial.

This the 6th day of September, 2024.

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY